IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT **1: 15 CR 445** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JUDGE BOYKO** |
| | ) | CASE NO. |
| TAMELA M. LEE, | ) | |
| OMAR ABDELQADER, | ) | Title 18, United States Code, Sections 1001, |
| ABDELRAHMAN ABDELQADER, and | ) | 1341, 1346, 1349, 1512 and 1951. |
| SAMIR ABDELQADER | ) | |
| | ) | |
| Defendants. | ) | |

General Allegations

At all times relevant to this Indictment:

1.     Summit County was one of two Ohio counties with a charter government, as authorized by the Article X of the Ohio Constitution.  Under its charter, Summit County voters elected a County Executive and an eleven-member County Council.  Eight members of the County Council were elected from individual districts and the other three were elected at-large.  County Council was the legislative authority, taxing authority and policy-making body of the Summit County government.  County Council had appropriation authority over County agencies and departments, including Summit County Juvenile Court and Summit County Children Services.

1

2.     The Akron Municipal Court, located in Summit County, Ohio, served the city of Akron, Ohio and other communities in the greater-Akron area.

3.     The Summit County Juvenile Court served Summit County, Ohio, which included the city of Akron, Ohio.

4.     Defendant TAMELA M. LEE ("Defendant LEE" or "LEE") was a member of Summit County Council.

5.     Defendant ABDELRAHMAN ABDELQADER ("Defendant ABDELRAHMAN" or "ABDELRAHMAN") was affiliated with several convenience stores and businesses located throughout the Akron area.

6.     Defendant OMAR ABDELQADER ("Defendant OMAR" or "OMAR") was affiliated with several convenience stores and other businesses located throughout the Akron area, including the Bi-Rite, owned by Person 11, which was located on Diagonal Road in Akron, Ohio.

7.     Defendants OMAR and ABDELRAHMAN were brothers.

8.     Defendant SAMIR ABDELQADER ("Defendant SAMIR" or "SAMIR") was ABDELRAHMAN's son and OMAR's nephew. During the period June 2014 through August 2014, SAMIR was a minor.

9.     LEE was not related to OMAR, ABDELRAHMAN and SAMIR.

10.    Public Official 1 ("PO1") was a high-ranking elected public official in the City of Akron.

11.    Public Official 2 ("PO2") was a high-ranking public official in the City of Akron Prosecutor's Office.

12.    Person 1 was related to Defendants ABDELRAHMAN, OMAR and SAMIR.

13.    Persons 2, 3, 4 and 6 were related to LEE.

14.    Person 5 was related to Defendants ABDELRAHMAN, OMAR and SAMIR and worked at the Bi-Rite.

15.    Person 7 was related to Defendants ABDELRAHMAN, OMAR and SAMIR. Person 7 was Person 1's father. Person 7 was affiliated with a retail store on West Market Street in Akron, Ohio.

16.    Person 8 was a fiduciary over LEE's campaign account.

The Criminal Cases

17.    On or about June 1, 2014, Person 1 and SAMIR were arrested by the Akron Police Department ("APD") following an altercation with a third individual ("Victim"). Following a mutual fight at a local business, the Victim departed in a vehicle. Person 1 followed the Victim in a separate vehicle; drove left of center and pulled in front of the Victim, blocking the Victim from going any further. Person 1 exited his vehicle and punched the Victim in the face through the window. The Victim exited the vehicle and the two exchanged punches in the street. The Victim knocked Person 1 to the ground and began walking to his vehicle. While the Victim was returning to his vehicle, SAMIR struck the Victim with a red Mercedes Benz. The force from the vehicle's impact thrust the Victim into the air, flipping him over onto the road. An APD officer was standing a block away when the incident occurred and saw Person 1 and the Victim fighting in the street and SAMIR striking the Victim with the vehicle. The APD Officer ran to the corner where he encountered two witnesses who had stopped SAMIR from leaving the scene in the Mercedes. Upon questioning, SAMIR admitted having purposely hit the Victim in defense of Person 1. SAMIR was sent to Summit County Juvenile Detention Center and charged with Felonious Assault. Person 1 was charged with Assault in Summit County Municipal Court.

18.     As the litigation progressed, Defendants OMAR and ABDELRAHMAN sought to press charges against the Victim for allegedly having assaulted SAMIR and Person 1 in an earlier encounter, which they believed would mitigate SAMIR and Person 1's sentences.

The Internal Revenue Service ("IRS") Matter

19.     Person 9 was acquainted with OMAR and related to Person 10.

20.     In or around 2013, Person 9 knew the IRS was investigating Person 10 for violations of certain federal criminal laws.  The IRS investigation had the potential to result in Person 10 serving a term of incarceration and suffering other financial penalties.

21.     In or around August or September 2013, OMAR told Person 9 that he (OMAR) could help Person 10 with the IRS-issue by enlisting LEE's assistance.

The Grand Jury further charges:

## COUNT 1
(Conspiracy to Commit Honest Services Mail and Wire Fraud,
18 U.S.C. §§ 1341, 1343 & 1346, in violation of 18 U.S.C. § 1349)

22.     Paragraphs 1-15 and 17-21 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### THE CONSPIRACY

23.     From in or around 2013 through on or about September 9, 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants TAMELA M. LEE and OMAR ABDELQADER and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit offenses against the United States; that is, to knowingly devise and intend to devise a scheme and artifice to defraud and to deprive Summit County of its right to the honest and faithful services of LEE, through bribery and kickbacks and the concealment of

4

material information related thereto and for the purpose of executing such scheme and artifice, to (1) cause matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346; and (2) cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

## OBJECT OF THE CONSPIRACY

24.     It was an object of the conspiracy that LEE used her official position to enrich herself and her designees by soliciting and accepting things of value from Defendant OMAR, the Bi-Rite, Person 9 and others, in return for performing and promising to perform favorable official action, both as requested and as future opportunities arose, and that Defendant OMAR and others enriched themselves and their designees by obtaining official action from LEE, both as requested and as future opportunities arose, through corrupt means.

## MANNER AND MEANS

It was part of the conspiracy that:

25.     LEE solicited and accepted things of value from OMAR and others, including: money; loans; campaign contributions; home improvements; home maintenance; and consumer goods.

26.     OMAR provided LEE with things of value both directly and through the Bi-Rite.

27.     At times, OMAR acted as a conduit between LEE and others. In that role, OMAR led other Akron-area businesses and business owners to believe that by providing LEE with things of value, LEE, in return, performed and promised to perform official acts to their benefit. OMAR also delivered things of value to LEE from others.

5

28.     LEE provided and promised to provide favorable official action for the benefit of OMAR, the Bi-Rite, others who provided her with things of value, and their designees, both as requested and as future opportunities arose.

29.     The official action LEE provided and promised to provide included LEE helping OMAR and his designees navigate government-agency bureaucracy, achieve favorable outcomes in judicial and administrative proceedings, and obtain streamlined access to information.

30.     OMAR and LEE concealed their illicit relationship, through, among other ways; not disclosing the things of value LEE solicited and received from OMAR.

31.     OMAR and LEE concealed and attempted to conceal the full extent to which LEE benefitted OMAR and others.

32.     LEE, OMAR and others used and caused to be used the United States mail and private and commercial interstate carriers to send and deliver mail matter, all in furtherance of the conspiracy.

33.     LEE, OMAR and others used and caused to be used interstate wire communications, including email communications, electronic fund transfers, electronic monetary transactions, and telephone calls, all in furtherance of the conspiracy.

Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, the conspirators performed these acts, among others:

34.     On or about July 5, 2013, LEE caused to be sent a letter to the State of Ohio Liquor Control Commission on behalf of Person 7's store, recommending approval of a liquor license application.  LEE signed the letter as the "District 5 Representative, Summit County Council."  LEE provided her County-issued cellular telephone number.

6

35.     On or about May 15, 2014, OMAR and Person 9 discussed OMAR helping Person 9 to obtain a letter of recommendation from LEE to benefit Person 10. OMAR said that it "needed some money," and explained that he helped arrange for LEE to write a letter for Person 7 in connection with a license. Person 9 offered to pay LEE in return for obtaining the letter.

36.     On or about May 19, 2014, OMAR and Person 9 discussed the letter from LEE to the IRS for Person 10.

37.     On or about May 19, 2014, immediately following OMAR's conversations with Person 9, OMAR called LEE.

38.     On or about May 22, 2014 at approximately 1:30 p.m., OMAR met LEE in the parking lot of Face's Night Club.

39.     On or about May 22, 2014, following her meeting with OMAR, LEE deposited approximately $100 in currency into her bank account at Chase Bank.

40.     On or about June 8, 2014 at approximately 8:24 p.m., OMAR spoke to Samir, who was incarcerated, about the timing of Samir obtaining a bond from the judge. OMAR told Samir that he (Samir) should be released from custody the following afternoon. Samir asked if "the lady" was coming the following day. OMAR said that he may go to her home or call her.

41.     On or about June 8, 2014 at approximately 9:08 p.m., OMAR and LEE had the following dialogue:

| | |
|---|---|
| OMAR: | That's b------t. I know eh, uh, I, I, uh, I need you tomorrow in, in, in the court room. |
| LEE: | What time? |
| OMAR: | 'Bout 3:00. |
| LEE: | I, oh, I have a meeting at 3:00. |

7

| OMAR: | You have a meeting at three? |
|---|---|
| LEE: | Yep. |
| OMAR: | Wow. |
| LEE: | With Child and Family Services. |
| OMAR: | Wow. |
| LEE: | I can call. I can email the judge. |
| OMAR: | You could email the judge? |
| LEE: | Yeah. |

Later in that conversation, after LEE and OMAR discussed the content of LEE's email to the judge, LEE complained about her financial situation. OMAR assured LEE, "We'll work it out. I mean, we work it out last summer, we work it out this summer, too."

42.     On or about June 9, 2014 at approximately 12:14 a.m., Defendants OMAR and Abdelrahman had a conversation about Samir and Person 1's court cases, including the following:

| ABDELRAHMAN: | Hi, OMAR. How are, did you talk to the woman today? |
|---|---|
| OMAR: | I talked to her. She said, uh, she said uh, she is not going to, uh, she can't because she has a meeting with that [UI] at 3:00 [talking in the background] but she said, "I'm gonna send her an email right now." |
| ABDELRAHMAN: | Yes. |
| OMAR: | So, I mean, she's supposed to have sent her an email. |
| ABDELRAHMAN: | What is she going to say in it? |
| OMAR: | She will tell her that they are claiming [OV] his family [talks on the side to other people] Peace be on you! [Talking in the background] Peace on you that he's a good guy and that he has nothing to do with the fight and [UI] like this. |
| ABDELRAHMAN: | Yeah. |

8

OMAR:                   Yeah. She's supposed to send them an email in a couple – three, four hours. She told me, "I'll make, I'll make a nice email and I'll send it to her."

43.     On or about June 9, 2014 at approximately 2:41 p.m., Defendants OMAR and LEE discussed Samir's case, including the following:

OMAR:                   Yeah. Did you send that email?

LEE:                    Ah, yeah. I sent it this morning.

* * *

LEE:                    You know then, you, you know feel free, you know, to say, you know, you know Councilwoman Lee, you know, is our cousin –

OMAR:                   Uh huh?

LEE:                    - you know, just claim me as your family, okay?

44.     On or about June 9, 2014 at approximately 2:49 p.m. and again at 2:50 p.m., LEE called a court employee who worked with Judge 1.

45.     On or about June 9, 2014 at approximately 5:48 p.m., Defendants OMAR and Abdelrahman discussed the court hearing. OMAR said that things "look good" and Samir Abdelqader would likely get "disorderly conduct," but Abdelrahman said he was not optimistic about the case.

46.     On or about June 9, 2014 at approximately 9:22 p.m., LEE and OMAR met in the Bi-Rite parking lot.

47.     On or about June 9, 2014 at approximately 10:19 p.m., Defendants OMAR and Abdelrahman discussed Samir's court case, including the following:

OMAR:                   TAMMY came and [line breaks up]

ABDELRAHMAN:  Yes.

OMAR:                   She told me, "OMAR, I talked to him about 2-2-5."

9

ABDELRAHMAN:     What?

OMAR:            She told me, "I talked to him about 255."

ABDELRAHMAN:     Yes.

OMAR:            And she told me that, that, uh, uh, that, that they, they promised to send her email to the magistrate and she told me, "Don't worry about it.  It's gonna be fine."

ABDELRAHMAN:     Don't worry about it?

OMAR:            Yes.

ABDELRAHMAN:     Did you tell her what happened that he [UI]?

OMAR:            I told her, I told her and she said, "Don't worry about, it.  It's going to be fine."  I already, she also talked to that bailiff and he told her that-that uh, uh, that they don't want nothing to do with this but, uh, it is a procedure.  She said, "Don't worry about it."  She said, "They are gonna make sure that the magistrate has my email and we are going to be talking to her, don't worry about it, it is gonna be fine."  I handed her, I handed her $200.

ABDELRAHMAN:     Hmm.

OMAR:            "Get this thing done for me and I will give you an additional 300."

ABDELRAHMAN:     What did she say to you?

OMAR:            She said, "Look don't worry about it."  She told me, "Without this," meaning without the money, and "I got it."

ABDELRAHMAN:     Ah, ah, what is the name uh, uh, at the beginning, they did not want anyone to talk with  [UI].

OMAR:            What?

ABDELRAHMAN:     They didn't want anyone to talk with [UI].

OMAR:            She told me, "I talked with them and we decided on 255."

ABDELRAHMAN:     Ah.

OMAR:            She told me, I talked with them, I don't know what time, I mean, they changed their attitude, but she told me, "I agreed with them on 255."

ABDELRAHMAN:     Ah, who did she talk with, then, with whom?

OMAR:     She told me, uh, she talked with, she told me she talked with those who are handling the case, the ones who, at the beginning, who started, I mean the bailiff, the bailiff gives it to the intake.

ABDELRAHMAN:     Ah.

OMAR:     - [UI] intake.

ABDELRAHMAN:     Ah.

OMAR:     She told, "And I," she told me, "They told me," they told her that it is not going to be a judge. She told me, "I am not going to get the judge involved." I mean to make the judge involved. She told me, "I will talk with the magistrate and will talk with the judge."

ABDELRAHMAN:     [OV] I'm just concerned about Samir, I don't want him to start his life with a felony, I mean.

OMAR:     Yeah, yeah, yeah, no, no, no, don't worry about this issue.

ABDELRAHMAN:     [Noise] [Sighs] They may let him eat s--t because he's a felon!

OMAR:     No, no, this I got it now. I handed her $200 and told her, "I'll give you $400 so you can end this matter." She told me, "Without this or that, I mean I already settled with them for 255," and they told her that "It is not going to be the judge, but the magistrate," and they told her that "I'm gonna, we are gonna make sure the magistrate, uh, uh, receives your email [UI]" and told me, "[UI], don't worry about it, I will talk with the magistrate and will talk with the judge himself."

48.     On or about June 9, 2014, LEE caused to be deposited approximately $200 in currency into her Huntington Bank account.

49.     On or about June 10, 2014 at approximately 12:13 a.m., OMAR had a discussion with Person 7 about the court cases. OMAR asked Person 7 to find out the name of the judge and send it to OMAR. OMAR, in turn, "will have that woman [LEE] send her an email or do something."

11

50.     On or about June 11, 2014 at approximately 4:37 p.m., OMAR called LEE and

had the following discussion about the court cases:

| | |
|---|---|
| OMAR: | Hey Miss TAMMY, how you doin'? |
| LEE: | I'm okay.  I was just thinkin' I said, "S--t, OMAR never reminded me to call [Judge 2]." |
| OMAR: | No, I didn't, I didn't uh, I didn't uh, because the court is tomorrow, not today. |
| LEE: | Okay. |
| OMAR: | The court is tomorrow at 2. So uh, I will call you later tomorrow and uh, remind you it's tomorrow morning. |
| LEE: | Okay. |
| OMAR: | What's going on? |
| LEE: | No uh – What's the guy, what's the, the kid's name that's goin' tom- goin' tomorrow? |
| OMAR: | [Person 1], [Person 1] I will, I will text you his name, full name. |
| LEE: | Okay. |
| OMAR: | First and last. |

51.     On or about June 12, 2014 at approximately 11:44 a.m., OMAR texted LEE,

"[Person 1] That his named [sic][.]"

52.     On or about June 12, 2014 at approximately 11:46 a.m., OMAR texted LEE,

"Please don't forget to call we have court today at 2.00 [sic][.]"

53.     On or about June 12, 2014 at approximately 11:51 a.m. and again at

approximately 1:04 p.m., LEE called Judge 2's chambers.

54.     On or about June 12, 2014 at approximately 1:20 p.m., LEE told OMAR she was

waiting for Court Employee 1 to return her call.  Defendant OMAR instructed LEE on ways to

commend Person 1, and told LEE he would call her at approximately 1:45 p.m.

55.     On or about June 12, 2014 at approximately 1:23 p.m., LEE called Judge 2's chambers.

56.     On or about June 12, 2014 at approximately 1:49 p.m., LEE told Defendant OMAR to have Court Employee 1 call her.

57.     On or about June 12, 2014 at approximately 9:43 p.m., Defendants OMAR and Samir had the following dialogue:

SAMIR:          What's it called, did you hear anything from that lady, or -

OMAR:           From the lady, no.  I mean, she was, she was there in the, she was there this morning.  She was (UI) this morning.

                            * * *

OMAR:           No, don't even, don't even worry about it man.  I'm gonna have this woman work heavy on this.  Real heavy on this.

SAMIR:          Okay.

OMAR:           Alright?

58.     On or about June 13, 2014 at approximately 12:43 a.m., OMAR told LEE that Person 1's hearing had been postponed until the following Tuesday.  LEE asked OMAR for money, and OMAR directed LEE to go to the Bi-Rite the following day to collect the money. OMAR told LEE to focus on the "situation" (involving the Person 1 and Samir Abdelqader). LEE told Defendant OMAR that she would call her friend at the Prosecutor's Office.

59.     On or about June 14, 2014 at approximately 4:32 p.m., LEE sent a text message to OMAR informing him that the judge and his bailiff returned her call.

60.     On or about June 14, 2014 at approximately 4:33 p.m., LEE sent a text message to OMAR, "I am going to bed, I am angry and frustrated and broke . . . bye[.]"

61.    On or about June 14, 2014 at approximately 11:29 p.m., Defendants OMAR and LEE discussed LEE's financial situation. OMAR told LEE to send her daughter to pick up money from the Bi-Rite. OMAR agreed to call the store clerk and direct the clerk to give LEE's daughter $50 in currency.

62.    On or about June 14, 2014 at approximately 11:31 p.m., Defendant OMAR spoke to Person 5, who was working at the Bi-Rite:

| | |
|---|---|
| OMAR: | TAMMY's daughter is coming to take $50 or TAMMY herself, okay? Fifty dollars. D--n that b---h!  Okay. |
| PERSON 5: | Who?  TAMMY? |
| OMAR: | TAMMY or TAMMY's daughter, either one of them. |
| PERSON 5: | Should I uh, should I give her from, uh, today's earnings? |
| OMAR: | Yes, from today's earnings.  Give her $50. |

63.    On or about June 14, 2014 at approximately 11:32 p.m., LEE told OMAR that Person 2 was en route to the Bi-Rite to collect money for LEE. Thereafter, LEE and OMAR discussed LEE's efforts to contact the judge.

64.    On or about June 16, 2014 at approximately 6:51 p.m., LEE and OMAR discussed a landscaper, whom OMAR had recently paid to service LEE's lawn. Thereafter, they discussed the criminal case. LEE said that she had not talked to the judge but would speak to him the following morning. LEE then told OMAR that she needed to replace money she had taken from her campaign account to cover her personal checking account. She hoped OMAR would help her raise money for her fundraiser in July, which would enable her to replace the money she had taken from her campaign account.

65.    On or about June 17, 2014 at approximately 1:10 p.m., approximately 15 minutes before a hearing in Person 1's case in Akron Municipal Court, LEE walked by Judge 2's

14

courtroom, down a private hallway and through a door marked "JUDGE [2] CHAMBERS,

[COURT EMPLOYEE 1], BAILIFF."

66.    On or about June 17, 2014 at approximately 1:13 p.m., LEE spoke to Judge 2.

LEE mentioned having called to ask how to serve as a character witness and indicated she was

asking because "you've got one of my relatives in your court." LEE identified the relative as

Samir Abdelqader. Judge 2 asked, "You mean [Person 1]?"

67.    On or about June 17, 2014 at approximately 1:33 p.m., LEE walked down the

hallway from Judge 2's administrative offices and motioned for OMAR to join her. They had a

brief, whispered conversation and took the elevator together to the lobby level. OMAR and LEE

left the courthouse and walked to a secluded area.

68.    On or about June 17, 2014, from approximately 3:40 p.m. through 4:47 p.m.,

Defendant OMAR and Defendant Abdelrahman placed a series of text messages about Person

1's court case.

69.    On or about June 20, 2014 at approximately 4:07 p.m., OMAR and Person 9 had

the following conversation about the IRS letter LEE was writing for Person 10:

| | |
|---|---|
| PERSON 9: | [UI] what happened with the woman regarding Person 10? |
| OMAR: | Nothing, by-God, I can go anytime and take the paper from the woman, she told me, "Whenever you ready, whenever you need it," and, "I got it." Anytime you need it the paper is available and ready in a second. |
| PERSON 9: | [UI]. |
| OMAR: | She came, she came to court with my nephew, I mean, she do whatever, you know what I mean? Whatever I tell her, she will do it. But she said whenever you need it, er, tell me and I will bring it to you in two seconds. |
| PERSON 9: | Okay, I need it anytime [], I need her to do it quickly. |
| OMAR: | What? |

15

PERSON 9:  Get her to do it in fastest way, I am dependent on her.

OMAR:  Ah, you want like you want it to be quicker?

PERSON 9:  Yeah, yeah.

OMAR:  Okay, done deal.

* * *

OMAR:  It's okay then I will get her to bring a copy for you and she will send another one to the IRS.

PERSON 9:  She give us copy and send another copy to them, that's what the church did with me.

OMAR:  That's what she did she did with Person 7, she sent to liquor control.

PERSON 9:  Yes.

OMAR:  Yes, and-

PERSON 9:  It's better this way it would be better, she send-

OMAR:  This is better, this is better-

PERSON 9:  Yes, yes-

OMAR:  From one government office to another government office.

* * *

OMAR:  I mean her presence, her presence change the whole situation man.

70. On or about June 24, 2014 at approximately 4:22 p.m., Defendant OMAR spoke to Person 9 about the IRS letter. Person 9 assured OMAR, "I will pay what she wants. I don't know, it's no problem, or if you pay her and then I will give you -." OMAR told Person 9, "It's no problem. She will get, she will get donations, uh, I don't want to talk on the phone. She will get donations [UI], I mean when she gets donations, she will get paid."

16

71.     On or about June 24, 2014 at approximately 5:51 p.m., OMAR told LEE that

Person 1 and Samir planned to file a police report, claiming that the Victim had assaulted them.

LEE confirmed that once the police report has been filed, it would be forwarded to the

Prosecutor's Office.  OMAR and LEE then had the following dialogue:

| | |
|---|---|
| OMAR: | Okay.  Well they gonna go in tomorrow to make the police reports can you, ca- call in this guy, uh, the head of the Prosecutors, talk to him about that? |
| LEE: | Yeah, I'll ca- I'll call [PO2]. |
| OMAR: | Huh? |
| LEE: | I'll call [PO2], yeah. |
| OMAR: | You'll call him.  Okay.  Let me, let me, let me, let me call you first as soon they make the police report, and I will call you so you could call just to make sure that the police report is, got done and uh - |

72.     On or about June 26, 2014 at approximately 1:00 a.m., LEE and OMAR discussed

Samir's case, the IRS letter and OMAR's request for LEE's help on another court-related issue.

At the end of the conversation, LEE complained to OMAR about her financial situation, and

OMAR assured LEE, "I have you covered."

73.     On or about June 26, 2014 at approximately 11:50 p.m., Samir, who was working

at the Bi-Rite, and OMAR had the following conversation:

| | |
|---|---|
| SAMIR: | Did you talk to TAMMY? |
| OMAR: | To who? |
| SAMIR: | Did you talk to TAMMY? |
| OMAR: | No, I haven't. |
| SAMIR: | She came, she talked to me. |
| OMAR: | Uh huh. |

17

| SAMIR: | Looking for you. |
| OMAR: | Ah, she was looking for me? |
| SAMIR: | She didn't know it was me.  But now [Audio breaking up] |
| OMAR: | She is gonna what? |
| SAMIR: | She didn't know it was me. |
| OMAR: | Uh huh. |
| SAMIR: | She said she was gonna send the judge another email. |
| OMAR: | Uh huh, she said she was gonna send the judge another email? |
| SAMIR: | Yeah, I don't know about what. She said she was gonna talk to you more. She's like, um, "Why haven't you guys pressed the charges yet?" |

74.     On or about June 27, 2014 at approximately 2:13 p.m., LEE told OMAR, "So, you never told me that Samir was the one that works in your store." OMAR replied, "I didn't know that you don't know." LEE replied, "No, I didn't know that." Additionally, LEE asked OMAR, "So, did you, uh, ever get the thing filed, because he says he goes to court Monday?" LEE clarified, "Did you guys ever file the charges against [the Victim]?" OMAR explained that they had not filed the charges. Later in the same conversation LEE stated, "I saw that prosecutor from, um, Doctor, uh, from [Judge 2's] court yesterday when I was down at the House of the Lord for the fugitive safe surrender . . . she said, oh, she said, you know, that worked out really well, you know, me talking to her." LEE then asked OMAR for money, and OMAR told her to come to the Bi-Rite at 5:00 p.m.

75.     On or about June 27, 2014 at approximately 7:57 p.m., LEE texted OMAR, "You are killing me.  You said 5:00[.]"

18

76.     On or about June 27, 2014, from approximately 8:09 p.m. to 9:56 p.m., LEE and

OMAR exchanged a series of text messages in which OMAR agreed that LEE could take $40

from the Bi-Rite:

| | |
|---|---|
| LEE: | Can I go the store and get $40.00[?] |
| OMAR: | Yes[.] |
| LEE: | Going now[.] |
| OMAR: | Ok[.] |
| OMAR: | Did u get it[?] |
| LEE: | Yes, thank you[.] |

77.     On or about June 28, 2014 at approximately 8:13 a.m., LEE and Person 4

discussed LEE's upcoming campaign fundraiser scheduled for July 17, 2014:

| | |
|---|---|
| LEE: | [H]opefully, you know, I'll, I'll put the whole thing on for under $1,000, and, um, OMAR's supposed to raise me $3,000, so – |
| PERSON 4: | You think he gonna to do it? |
| LEE: | Well he got plenty of d--n time to do it so, that covers my, my expenses up front, and, um, and then everything else would be profit, and then I'll, I'll, um, start, um, right at summer time, I'll plan my birthday fundraiser so that all I'll have to do is pull the trigger on it when it's time – |

78.     On or about July 2, 2014 at approximately 4:56 p.m., OMAR told LEE that his

relatives filed a complaint, but the Prosecutor's Office was uncertain as to whether it would file a

case. They then had the following dialogue:

| | |
|---|---|
| OMAR: | Now, and now, this, uh, this they said that they talked to the supervisor, the prosecution supervisor. |
| LEE: | Uh huh. |
| OMAR: | He's the one giving little bit hard time to, to, to, to accept the case. So I don't know if you uh, if you're able to - |

19

LEE:            (OV) I know her, that's [PO2].  I'll call [PO2].  I know who the
                supervisor is that's [PO2].

OMAR:           (OV)(UI)  Is it a guy or a woman?

LEE:            It's a woman!

OMAR:           Okay they, because they said, they said that it was a guy that
                called, called the (UI) supervisor.

LEE:            (OV)  Well I don't, I don't know who it is but, but everybody's
                boss, I know everybody's boss is [PO2], and I'll call [PO2].

OMAR:           Please, uh please can you call them back and let me know?
                Whenever he talks to them.

LEE:            Yes.  (OV) I mig -Yeah, I might not get her tonight but I'll, I'll,
                I'm going to send her a text message and tell her to call me.

Then, LEE asked OMAR for his nephews' names.

79.     On or about July 4, 2014 at approximately 12:35 a.m., LEE and OMAR discussed

Defendant Samir and Person 1 trying to press charges against the Victim.

OMAR:           Yeah.  So what's going on anything?  Did you hear anything from
                that, that woman?  Did you contact that woman?

LEE:            No, she didn't call me back, but I talked to [PO1], so he said he
                was going to make sure she calls me.

OMAR:           Oh, you talked to [PO1]?

                                    * * *

LEE:            I didn't tell [PO1] no story, I just said I was trying to get in touch
                with her about my, uh friends, the Abdelqaders.  But, I didn't get a
                call back, and he said he'll make sure she calls me.

OMAR:           I wanna make sure this guy did, does get charged because if he
                does get charged, it's gonna make, it's gonna make it look a lot
                better for Samir –

LEE:            Yeah.

20

80.   On or about July 7, 2014 at approximately 12:35 p.m., LEE went to the Bi-Rite.

81.   On or about July 7, 2014 at approximately 6:53 p.m., OMAR updated LEE on her conversation with PO2.

82.   On or about July 7, 2014 at approximately 7:18 p.m., Samir, who was working at the Bi-Rite, asked OMAR, "Did you take any cash?" OMAR replied, "No, no, I took $20 and gave it to that woman."

83.   On or about July 8, 2014 at approximately 1:39 p.m., LEE told OMAR that LEE would likely speak to PO2 that day, and LEE asked OMAR for money.

84.   On or about July 9, 2014 at approximately 3:06 p.m., LEE asked OMAR to raise money for her campaign and, in the short term, to lend LEE money for personal expenses. OMAR agreed and asked LEE for an update on her conversation with PO2.

85.   On or about July 9, 2014 at approximately 8:31 p.m., OMAR asked LEE whether she heard anything from PO2. The call disconnected. OMAR immediately called back. LEE told OMAR that she would send a text message to PO2 and asked for the spelling of Samir and Person 1's last names.

86.   On or about July 9, 2014 at approximately 8:34 p.m., LEE sent a text message to PO2, "Hi [PO2], can you call me tomorrow about my husband's cousin Samir Abdelqader+ [.]"

87.   On or about July 10, 2014 at approximately 8:15 a.m., LEE and PO2 had the following dialogue:

| | |
|---|---|
| PO2: | What can I help you out with? |
| LEE: | Um, I was just calling because um, when they had, first had that incident. |
| PO2: | I don't, I don't know what we're talking about. |

| LEE: | Okay, uh, the boy on Arlington who tried to destroy the guy with the car, anyway. Like my favorite, favorite, favorite people. I know Samir, I don't know the other boy. Samir works right here right around the corner from me. But anyway, I had asked them, why did anybody, you know the other guy was 28 and they were 17. I said, "Why wasn't the 28-year-old charged?" And anyway they said they had come down, the parents came down to um press charges against the 28-year-old. And I just told them, I said, "Well look, I'll call [you], and I'll just tell her what I know." And I'm not trying to influence you, you can't say I'm trying to influence you. I'm trying to make you think. That's all I'm trying to do; just trying to make you think. |
| --- | --- |
| PO2: | I'm having a real hard time understanding you. Who actually was charged? Who was charged with something? |
| LEE: | Okay. Samir Abdelqader. |
| PO2: | How do you spell all that? |
| LEE: | A-b-d-e-l-q-a-d-a-r first name Samir. S-a-m-i-r. |
| PO2: | And what was he charged with? |
| LEE: | Samir was um, assault. |

* * *

| PO2: | Alright, I'm going to have to look at this stuff and call you back because none of this story is making sense. |
| --- | --- |
| LEE: | Is what? |
| PO2: | I'll pull some police reports and I'll call you back. |
| LEE: | Okay honey and then maybe I'll make more sense when you know what I'm talking about. |

88.    On or about July 10, 2014 at approximately 1:10 p.m., LEE left a message for OMAR that LEE had spoken with PO2.

89.    On or about July 10, 2014 at approximately 3:51 p.m., LEE and OMAR agreed to meet at the Bi-Rite.

22

90.     On or about July 10, 2014 at approximately 6:12 p.m., LEE told OMAR that she went to the store but OMAR was not there. She asked OMAR for money. They then had the following dialogue:

LEE:            You gonna raise some. You gonna raise some money for me I wouldn't have this problem.

OMAR:           I am. I am gonna go raise some money. I am. I promise you. It's just, you know, things are not (UI) but I will go raise some money for you.

LEE:            Well, um, you got my message that I did talk to the prosecutor today, um, she said she was gonna call me back but she didn't. She hasn't called me back yet.

91.     On or about July 10, 2014, LEE caused to be deposited approximately $110 in currency into her Huntington Bank account.

92.     On or about July 16, 2014, LEE called the court and asked for a prosecutor for Judge 2 who sat across the hall from him.

93.     On or about July 21, 2014 at approximately 5:06 p.m., OMAR and LEE debated the amounts of previous payments LEE received from the Bi-Rite, including having the following dialogue:

OMAR:           TAMMY, the last time you was, you needed money, I think, was $200.

LEE:            Yep.

OMAR:           I had the money, I ga [cuts out] that day, I ga-

LEE:            Yeah, that was a few months though.

OMAR:           No, no, no, no this is about, maybe about a month [cuts out] if I didn't have it I would tell you wait couple days then I will take care of it. So what makes you think that if I don't have it that I can't tell you, TAMMY I don't have it, I can't cover it right now.

LEE:  OMAR.  When I told you I needed the $200, you ended up giving me $40, 'cause remember I told you I got the money out of my campaign account.  I went and got $400 out of my campaign account.  I never got that $200 from you.  You gave me $40 'cause I said I took care of it, I got the money out of my campaign account, and I said and that's why I just need you to help my raise money for my fundraiser so I can put that money back.

OMAR:  I'll give you the $200, I'll give you the $200.  I'll give you that $200.  I said, "I'm gonna get it from my money account," and I tell you, "Don't worry about it."

LEE:  Well then maybe I'm crazy.

OMAR:  Eh, eh, I, I'll give it to you in the p- parking lot behind the building.  I give it to you, the $200.  I'm not sayin, I'm sayin [OV] my point was -

LEE:  You did give me $200, okay, I remember now, I remember you walking out, out (UI) you hand it to me in my hand.

\* \* \*

LEE:  When are you leaving the country?

OMAR:  Uh, on the third.

LEE:  See, you gonna be leaving in two weeks.

OMAR:  In two weeks, yes.  On the third.

LEE:  Well, then I mean, I guess 'cause then, you know, if you weren't able to raise any money, you know, for the fundraiser, then that means the plan we had, that I, for me to survive, I mean, I gotta come up with something new.  'Cause I, you know, I was not asking for that money, it's like if you would work raising some money, you know, from the people in the community for the fundraiser and then I know I can survive.  I'm getting ready to pull up to the window and I don't want them to hear us talking 'cause, I'm in my mamma's new car, so you know, I put you on the damn tele, car, wifi, the thing everybody in the world can hear you talkin', so, so you call me this evening?  Okay, hold on one second though.  Okay?

24

OMAR:          Okay.

LEE:           OMAR said give me $40.  OMAR?

94.     On or about July 22, 2014 at approximately 9:37 a.m., LEE caused to be made an interstate wire communication to facilitate payment on her cellular telephone bill.

95.     On or about July 22, 2014 at approximately 11:03 p.m., OMAR told LEE, "I'm, yeah, I'm gonna try to uh, try to do, uh, try to go for donations sometime this week, this week. If it's not, it will be the beginning of next week. I will go and try to collect some money for you. Uh, but I will get it done before I leave out of here, that way you will have plenty too, you know what I'm saying, while I'm gone." OMAR assured LEE, "I'll, I'll, I will get on it. Uh. Either the end of this week or the beginning of next week. Try to get a good amount that way you're good to go until I get back."

96.     On or about July 23, 2014 at approximately 2:22 p.m., LEE asked OMAR for money. OMAR agreed and directed her to the Bi-Rite.

97.     On or about July 23, 2014 at approximately 2:27 p.m., LEE instructed Person 2 to pick up money from the Bi-Rite.

98.     On or about July 23, 2014 at approximately 2:40 p.m., OMAR instructed the Bi-Rite to give money to LEE.

99.     On or about July 23, 2014, LEE caused to be deposited currency into her personal Huntington Bank account.

100.    On or about July 23, 2014 at approximately 7:44 p.m., Person 9 asked Defendant OMAR about the status of the IRS letter for Person 10. OMAR recounted his conversation with LEE the prior day, stating that she (LEE) told OMAR that she would go to the office that Thursday and would determine if the letter had been mailed.

25

101.    On or about July 24, 2014 at approximately 6:36 p.m., after LEE complained about her financial situation, OMAR told LEE, "I will uh, I'm gonna work on that, on that raising money." OMAR then discussed the IRS letter for Person 10.

102.    On or about July 25, 2014 at approximately 3:08 p.m., OMAR left LEE a voicemail to remind LEE about the IRS letter.

103.    On or about July 25, 2014 at approximately 3:12 p.m., OMAR reminded LEE about the IRS letter. LEE stated that the letter had not been mailed, so she just told "him" to email the letter to LEE so she could print it out at home to bring it to OMAR at the store.

104.    On or about July 25, 2014 at approximately 3:40 p.m., Defendant OMAR told Person 9 that he (OMAR) should receive the IRS letter that day.

105.    On or about July 26, 2014 at approximately 1:45 p.m., LEE told OMAR, "I didn't get that letter done, or come up there, so." LEE added, "And he didn't send me the letter, he just sent me a d--n blank letterhead so . . . I have to re-type it. . . . And, it's been so long, OMAR, I don't even remember. You have to tell me again, what it is that you need?" OMAR replied, "Uh, just saying that you know this guy and you know his family, and he's a good, you know, good person, and, you know, your knowledge of them is, you know, they're good people, and, you know, something like that. Something just to show that you . . . his, his behaviors and stuff like that, you know." LEE asked where the letter needed to go to which OMAR replied, "[H]e has an issue with the IRS, so, to the people at, you know, from the IRS." OMAR provided LEE with Person 10's name. OMAR suggested he would send LEE a text message with Person 10's name and the address for the IRS.

106.    On or about July 26, 2014 at approximately 2:03 p.m., OMAR sent LEE a text message with the IRS supervisor's name and mailing address.

107.    On or about July 26, 2014 at approximately 3:00 p.m., LEE asked if OMAR could come to LEE's home to pick up the letter.  LEE said, "I feel better enough to actually write a letter today, but, I'm hungry, I don't have any cigarettes."  OMAR asked if LEE wanted him to bring her a pack of cigarettes and some food.  LEE asked OMAR to bring both food and cigarettes.

108.    On or about July 26, 2014 at approximately 3:31 p.m., OMAR told LEE that he was on his way to her house with the items LEE requested.

109.    On or about July 26, 2014 at approximately 3:59 p.m., OMAR and Person 9 discussed the status of the IRS letter.

110.    On or about July 29, 2014 at approximately 5:29 p.m., LEE wrote a text message to OMAR, "Any luck on fundraising?"

111.    On or about July 29, 2014 at approximately 10:31 p.m., OMAR told LEE he was leaving the country that Sunday.  LEE replied, "Oh my God. . . . Now you makin', now you making me scared, OMAR," followed by, "Now you making me scared, 'cause you gonna be gone and I will be . . . screwed."  Defendant OMAR answered, "No, no, no I'll get it.  No, no, no I'll get it, you're not gonna be screwed.  I guarantee I'll get it.  And just, and I'm gonna make sure I get it before I leave."

112.    On or about July 29, 2014 at approximately 10:43 p.m., OMAR agreed to LEE's request for money.  LEE immediately followed, "Okay.  I'll be up there in a minute."

113.    On or about July 29, 2014 at 1:24 a.m., LEE asked OMAR if he had raised money for her.  OMAR stated that he would start raising money the following day.

114.    On or about July 30, 2014, LEE caused to be made an interstate wire communication to make a payment to Sprint on her cellular telephone bill.

27

115.   On or about July 30, 2014 at approximately 9:17 p.m., OMAR asked LEE what was "going on", to which LEE replied, "You know what's going on." OMAR told LEE that he went to three people and "got $500, so far." OMAR added, "I got 500 for you from those people." LEE replied, "That's good, so far, you know, I can put that in the bank, for tomorrow." OMAR informed LEE that $200 was from Person 9. OMAR told LEE that he did not bring her the money that night or the following day, he would leave the money with Person 5. LEE asked and OMAR confirmed that he was leaving the country that Sunday. OMAR added, "I still got time to go and try to get some more money, ya know." LEE replied, "Okay, well I appreciate it, OMAR." Defendant OMAR stated, "Ya know, like I said, I just went to three people and I got $500, you know what I'm sayin'?" LEE thanked OMAR before OMAR asked if LEE heard anything from the judge handling his nephew's case. LEE asked, "The prosecutor?" OMAR clarified that it was the judge for Samir's case and LEE replied, "No, you didn't ask me, you didn't ask me to do anything else."

116.   On or about July 30, 2014, OMAR told Person 9 that he collected $800 in donations: $200 from his brother, $200 from his uncle and $300 to $400 from himself (OMAR). OMAR said that he always told LEE the donors' names. OMAR told Person 9 that it would be sufficient for Person 9 to donate $200. OMAR explained that LEE truly provided service, and OMAR did not use LEE's assistance unless the person receiving the help was very close. OMAR added, "In other words, I am keeping her for us because we need her, man." OMAR gave Person 9 an example, citing LEE's help in securing Child 1's return home following the dismissal of a Children Services case. Person 9 exclaimed, "She is better than an attorney to us!"

117.   On or about July 30, 2014, OMAR told Person 9 about another case in which LEE spoke to the judge and thereafter, the case ended favorably. Person 9 expressed a willingness to

28

pay "her" more than an attorney. OMAR replied that LEE did not charge much, merely every day "she" asked for a pack of cigarettes and $20 or $40, which cost OMAR $400 to $500 per month. During that conversation, OMAR provided another example of LEE's value. OMAR identified an individual who was caught with drugs and food stamp violations. OMAR said that LEE helped him restore his license.

118. On or about July 31, 2014 at approximately 12:20 p.m., OMAR told LEE he left money for her with Person 5.

119. On or about July 31, 2014, LEE caused to be deposited $400 cash into her personal Huntington Bank account.

120. On or about August 2, 2014 at approximately 11:28 p.m., LEE inquired about what time OMAR would be leaving the country the following day. OMAR indicated he was leaving for the airport at 4:00 p.m. adding, "I'm gonna try in the morning to go raise up something for you before I get out of here." LEE responded, "Oh, that'll be nice." OMAR again stated, "I'm gonna try to go in, in the morning, and to do this, you know, to, to hustle up for you a little bit." OMAR added, "I'm gonna introduce you uh, to, to, to this guy [Person 9] also just in case if you need help and uh, while I'm gone you probably could give him, you know, give him a buzz." OMAR stated that he would bring "him" by if LEE was around and to "just give him a call or something if you need any, you know, any type of help or whatever." The call was suddenly disconnected and after it was reinitiated, LEE instructed OMAR, "Tell Person 5, don't be giving me grief while you gone." OMAR replied, "Don't worry about that. I'll get that straight," adding, "Like I said, I'll, I'll go in early in the morning and do what I need to do." OMAR stated that he had not been in the store since he talked to LEE and asked LEE if she

picked up the money from Person 5. LEE answered, "Yeah. I went and put it in the bank that day."

121.    On or about August 4, 2014 at approximately 12:18 p.m., LEE spoke to Person 9. LEE asked if Person 9 was calling about the IRS letter. LEE indicated that she would mail the letter when she went into the office later that day. Person 9 replied, "I love you to h--l." After a brief discussion about OMAR, Person 9 said, "If you need any help, you have my phone number, just call me. . . . That's what OMAR he told me. Take care of her, you take care of, we'll go, we'll go from there. If you need anything, just call me." LEE replied by laughing and saying, "Well I appreciate you and OMAR both, very much."

122.    On or about August 4, 2014 at approximately 4:56 p.m., LEE sent an email to PO3, a County employee, regarding the "Letter for OMAR and [Person 9]," asking PO3 to "please print the letter and create envelope and mail."

123.    On or about August 7, 2014, LEE caused to be drafted a letter to the IRS on letterhead of Summit County Council, signed by LEE as "Summit County Council District 5 Representative." LEE wrote, "I have known [Person 10] and his family for 10 years. I have had numerous opportunities to work with and engage the family in the community on various issues related to the conduction of business." LEE concealed from the IRS that she had never met Person 10 and had only recently met Person 9.

124.    On or about August 12, 2014 at approximately 3:21 p.m., Person 9 and LEE had the following dialogue:

PERSON 9:          Okay I, I'm out of town and tomorrow I'm coming back to Akron. You want to come by tomorrow to see (UI) I'll check your car, or what?

LEE:                    Yes.

30

PERSON 9: Okay, I'll give you a call tomorrow. We'll see what, what time. I'm come back, I give you a call. I need, you need to come to my shop. I, I, I'll take care of you.

LEE: Okay, and can I borrow $50?

PERSON 9: You want $50?

LEE: Yeah, 'cause I'm broke.

PERSON 9: Okay, well as soon as I'm come back, because I am out of town. I'll be back about between 2:00 and 2:30, 3:00 at the most. I give you a call for sure.

LEE: Tomorrow?

PERSON 9: Yeah.

LEE: Okay.

PERSON 9: Last time I sent you I sent a, I sent ya $200 with OMAR. He give it to you?

LEE: Um, yes he gave that to me, 'cause that was for the stuff I had to do last, that week.

PERSON 9: Okay, tomorrow, I'll take care of you tomorrow for sure. Did you send the letter to the IRS for me?

LEE: Uh huh. I sent it that day. I told you I was gonna send it last Monday. It went last Monday.

125. On or about September 3, 2014 at approximately 2:25 p.m., OMAR, who had returned from his overseas trip, asked:

OMAR: What's going on how you been?

LEE: I've been okay, you know, I've been broke since you been gone. Nobody going to take care of me like you, OMAR. [Person 9] fixed my car for me, but I've been broke like a dog.

126. On or about September 7, 2014 at approximately 5:20 p.m., LEE asked Person 2 to pick up merchandise from the Bi-Rite.

31

127.   On or about September 7, 2014 at approximately 8:22 p.m., LEE, who was in the Northern District of Ohio, asked OMAR, who was in Pennsylvania, to borrow money.

128.   On or about September 8 and 9, 2014, LEE caused to be deposited approximately $500 into her personal Huntington Bank account.

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 2
(Honest Services Mail Fraud, 18 U.S.C. §§ 1341, 1346 and 2)

129.   Paragraphs 1, 4, 6 and 19-21 and the factual allegations set forth in paragraphs 35-37, 69, 70, 72, 100-110 and 115-124 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

130.   From in or around September 2013 through on or about August 12, 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants TAMELA M. LEE and OMAR ABDELQADER, aiding and abetting one another, did knowingly devise and intend to devise a scheme and artifice to defraud and to deprive Summit County of the honest services of LEE by means of materially false and fraudulent pretenses, representations, promises, and material omissions.

It was part of the scheme that:

131.   LEE secretly used her official position to enrich herself and her designees by soliciting and accepting things of value in exchange for performing favorable official action to benefit Person 9 and Person 10.

132.   OMAR facilitated LEE obtaining bribes and kickbacks by serving as an intermediary between Person 9 and LEE.

133.    OMAR provided LEE with the address to which to mail correspondence, which was material to this scheme.

134.    LEE made false and misleading statements to the Internal Revenue Service.

135.    On or about August 7, 2014, in the Northern District of Ohio and elsewhere, LEE, for the purpose of executing the above-described scheme and artifice, caused a matter to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in accordance with the directions thereon, to wit:  a letter from LEE on Summit County Council letterhead mailed to the IRS in Akron, Ohio.

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

The Grand Jury further charges:

**COUNT 3**
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

136.    Paragraphs 1-15 and 17-21 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

At all times relevant to this Indictment:

137.    The operations of the Bi-Rite affected interstate commerce.

138.    The operations of Summit County, Akron Municipal Court, Summit County Juvenile Court and relevant state agencies affected interstate commerce.

139.    The operations of the Internal Revenue Service affected interstate commerce.

140.    The operations of Person 9's company affected interstate commerce.

The Conspiracy

141.    Beginning in or around March 2013 and continuing until in or about September 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendants TAMELA M. LEE and OMAR ABDELQADER did

knowingly and intentionally combine, conspire, confederate and agree with each other to

obstruct, delay and affect commerce and the movement of articles and commodities in commerce

by extortion; that is, LEE, assisted by OMAR, obtained property not due to her and her office,

from Bi-Rite, Person 9 and others with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 4
(Hobbs Act, 18 U.S.C. §§ 1951 and 2)

142.     Paragraphs 1-15 and 17-21 of this Indictment are re-alleged and incorporated by

reference as if fully set forth herein.

143.     From in or around March 2013 and continuing through in or around September

2014, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant TAMELA M. LEE, aided and abetted by Defendant OMAR

ABDELQADER, did knowingly obstruct, delay and affect and attempt to obstruct, delay and

affect commerce and the movement of articles and commodities in commerce by extortion; that

is, LEE obtained property not due to her and her office, from Bi-Rite, Person 9 and others, with

their consent, under color of official right.

All in violation of Title 18, United States Code, Sections 1951 and 2.

The Grand Jury further charges:

## COUNT 5
(Obstruction of Justice, 18 U.S.C. § 1512(c)(2))

144.     Paragraphs 1-21 and the factual allegations set forth in Count 1 of this Indictment

are re-alleged and incorporated by reference as if fully set forth herein.

34

General Allegations Related to LEE Campaign Account Fraud

145.   In or around April 2011, LEE caused to be created the political campaign committee, "Elect Tamela Lee."

146.   On or about June 16, 2014 at approximately 6:51 p.m., LEE told Omar that she needed to replace money she had taken from her campaign account to cover her personal checking account. She hoped Omar would help her raise money for her fundraiser in July, which would enable her to replace the money she had taken from her campaign account.

147.   On or about June 26, 2014 at approximately 6:53 p.m., LEE and Person 6 had the following dialogue:

| | |
|---|---|
| LEE: | That way anything come up I'll have the money. |
| PERSON 6: | He must.  He must be liking you, TAMMY. |
| LEE: | No, Omar ask me for more d--n favors. |
| PERSON 6: | Oh really? |
| LEE: | Oh my God yes, 'cause him and his people, them folks always in trouble. |
| PERSON 6: | Really? |
| LEE: | They have more d--n issues, they don't make no d--n sense. |

148.   On or about July 10, 2014 at approximately 7:21 p.m., LEE spoke to Person 8. She asked if he had the campaign checkbook with him because LEE was overdrawn on her [personal] checking account adding, "I gotta get $100 and Omar, he gonna raise some money for me, so then I can pay for the rest of the stuff and you know, and plus you know make a deposit, you know before next Thursday."

149.   On or about July 21, 2014 at approximately 5:06 p.m., LEE and Omar discussed money Omar had previously given to LEE. During that conversation, LEE said, "Omar.  When I

35

told you I needed the $200, you ended up giving me $40 'cause remember I told you I got the money out of my campaign account. I went and got $400 out of my campaign account. I never got that $200 from you. You gave me $40 'cause I said I took care of it. I got the money out of my campaign account. And I said and that's why I just need you to help me raise money for my fundraiser so I can put that money back."

150. On or about August 21, 2014 at approximately 9:49 a.m., LEE discussed attending a black-tie event with Person 4. LEE said, "I can't imagine, twin, if I had had to buy a ticket for this d--n thing, 'cause it's is like, this is very expensive getting ready for this and there is no way under the sun I'd be able to do it without . . . my campaign account. I mean, I would, I would be screwed."

151. On or about August 28, 2014 at approximately 9:24 p.m., LEE told Person 6 that she was "broke," having spent "crazy ridiculous amounts of money" on attire to attend a gala. LEE said, "S--t, I need Omar to hurry up and come home."

General Allegations Related to the Federal Grand Jury Investigation

152. From in or around November 2013 through the date of the filing of this Indictment, the Federal Bureau of Investigation ("FBI") and a federal grand jury in the Northern District of Ohio were investigating allegations of public corruption concerning Summit County Councilperson LEE for soliciting and accepting things of value in return for LEE performing and promising to perform official acts, as set forth in Counts 1-5 of this Indictment. The FBI was also investigating LEE's misuse of her campaign funds, as set forth above. In conjunction therewith, a federal grand jury issued subpoenas demanding production of certain documents and items related to these allegations (collectively, hereinafter, "Bribery Investigation"). The federal

grand jury also issued subpoenas to witnesses to testify in connection with the Bribery Investigation.

153.    Part of the Bribery Investigation centered on Omar seeking LEE's help with: (1) the IRS investigation into Person 10; (2) Samir and Person 1's criminal cases; (3) prior cases involving Omar's relatives; (3) Person 7 obtaining a license; and (4) a series of matters pertaining to obtaining licenses, permits, and information related to real estate and businesses in the greater-Akron area.

154.    On or about September 9, 2014, in one of the first overt steps in the Bribery Investigation, the FBI conducted simultaneous interviews of LEE, Omar, Abdelrahman, Samir and others.

The Offense

155.    From on or about August 29, 2014 through on or about January 26, 2015, the exact dates unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant TAMELA M. LEE did corruptly otherwise obstruct, influence and impede any official proceeding, namely, a federal grand jury investigation, and did corruptly attempt to do so.

It was part of the offense that:

156.    On or about August 29, 2014, LEE, suspecting that Person 9 was cooperating with law enforcement and was recording his conversations with her, discarded into the trash certain items related to Person 9, including the character letter to the IRS she had written on behalf of Person 10.

157.    LEE took various actions in an attempt to convey and cause to be conveyed false information to law enforcement and a federal grand jury.

37

158.   LEE created and caused to be created false and misleading entries in documents.

159.   On or about September 9, 2014 at approximately 11:46 a.m., after the FBI concluded its interview with LEE, LEE and Omar had the following conversation:

| | |
|---|---|
| LEE: | Why the f--k did the FBI just leave my house about you and your family? |
| OMAR: | Huh? |
| LEE: | The FBI just left my house. |
| OMAR: | Uh huh.  About what? |
| LEE: | Every letter I've ever done for you and your family. |
| OMAR: | Yeah.  They are, they was at my house, too. |
| LEE: | You talk to them? |
| OMAR: | Yeah.  I talk to them.  They ask me, you know, they ask me I said, you know, "I know your husband.  Me and your husband are good friends."  And uh, they ask me if uh, there was any money was tra- you know, exchanged or I never give you s--t anyway.  I never give you any do- any money anyway.  So what's the problem? |
| LEE: | I told them, I said, "If I need money and he knows I have a problem and he'll loan me money.  But it's a loan.  I have to pay that money back." |
| OMAR: | Yeah.  Absolutely.  I mean, this, this, this - Exactly.  There was nothing given for free, never anything (background: and you never did s--t for us). |

All in violation of Title 18, United States Code, Section 1512(c)(2).

The Grand Jury further charges:

## COUNT 6
(False Statements to Law Enforcement, 18 U.S.C. § 1001)

160.   Paragraphs 1-21 and 145-154 and the factual allegations set forth in Count 1 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

38

### The Offense

161.    On or about September 9, 2014, in the Northern District of Ohio, Eastern

Division, Defendant TAMELA M. LEE, knowingly and willfully made material false statements

to Special Agents of the FBI in a matter within the jurisdiction of the executive branch of the

Government of the United States, that is:

(1)   When Special Agents of the FBI asked about the hearing before Judge 2, LEE said:

      A.     LEE met OMAR outside the court. While they were standing outside the courtroom, Judge 2 walked by and asked LEE why she was there. LEE did not have a conversation with Judge 2 and simply told him she was there to attend the hearing.

      B.     LEE said she did not call or send a letter to Judge 2 regarding the matter.

      C.     LEE said that she (LEE) was present in the courtroom for the hearing and told the prosecutor she was there to do whatever she could to help.

      D.     LEE stated that she never talked to anyone with the prosecution.

(2)   When asked about her financial relationship with OMAR, LEE said that OMAR helped her a little bit last summer and from May until now and loaned LEE approximately $1,000. LEE always pays the money back on Friday when she gets paid. LEE told the FBI if someone looked at her Huntington back records he/she would see LEE making payments to the store for the items she got on credit.

(3)   When asked about her financial relationship with Person 9, LEE said that Person 9 fixed LEE's air conditioning and panel. LEE had the work done on credit and will pay for it when she gets paid.

162.    LEE well knew when she made the statements to Special Agents of the FBI that

the statements were false.

All in violation of Title 18, United States Code, Section 1001.

The Grand Jury further charges:

## COUNT 7
(Obstruction of Justice, 18 U.S.C. § 1512(c)(2))

163.    Paragraphs 1-18 and 152-154 and the factual allegations set forth in Count 1 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### The Offense

164.    From on or about September 9, 2014, through in or around November 2014, the exact dates unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant ABDELRAHMAN ABDELQADER did corruptly otherwise obstruct, influence and impede any official proceeding, namely, a federal grand jury investigation, and did corruptly attempt to do so.

165.    It was part of the offense that ABDELRAHMAN took various actions in an attempt to convey and cause to be conveyed false information to law enforcement and a federal grand jury.

All in violation of Title 18, United States Code, Section 1512(c)(2).

The Grand Jury further charges:

## COUNT 8
(False Statements to Law Enforcement, 18 U.S.C. § 1001)

166.    Paragraphs 1-18 and 152-154 and the factual allegations set forth in Count 1 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### The Offense

167.    On or about September 9, 2014, in the Northern District of Ohio, Eastern Division, Defendant ABDELRAHMAN ABDELQADER, knowingly and willfully made

40

material false statements to Special Agents of the FBI in a matter within the jurisdiction of the

executive branch of the Government of the United States, that is:

    (1)    ABDELRAHMAN said that Lee did not make any phone calls or talk to anyone associated with Samir Abdelqader's case.

    (2)    ABDELRAHMAN said that he had no knowledge of Omar Abdelqader providing any money to Lee.

168.    ABDELRAHMAN ABDELQADER well knew when he made those statements

to Special Agents of the FBI that the statements were false.

All in violation of Title 18, United States Code, Section 1001.

The Grand Jury further charges:

### COUNT 9
(Obstruction of Justice, 18 U.S.C. § 1512(c)(2))

169.    Paragraphs 1-21 and 152-154 and the factual allegations set forth in Count 1of

this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

The Offense

170.    From on or about September 9, 2014, through in or around November 2015, the

exact dates unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and

elsewhere, Defendant OMAR ABDELQADER did corruptly otherwise obstruct, influence and

impede any official proceeding, namely, a federal grand jury, and did corruptly attempt to do so.

It was part of the offense that:

171.    OMAR took various actions in an attempt to convey and cause to be conveyed

false information to law enforcement and a federal grand jury.

172.    On or about September 9, 2014 at approximately 11:46 a.m., after the FBI

concluded its interview with OMAR, Lee and OMAR had the following conversation:

LEE:        Why the f--k did the FBI just leave my house about you and your family?

OMAR:       Huh?

LEE:        The FBI just left my house.

OMAR:       Uh huh. About what?

LEE:        Every letter I've ever done for you and your family.

OMAR:       Yeah. They are, they was at my house, too.

LEE:        You talk to them?

OMAR:       Yeah. I talk to them. They ask me, you know, they ask me I said, you know, "I know your husband. Me and your husband are good friends." And uh, they ask me if uh, there was any money was tra- you know, exchanged or I never give you s--t anyway. I never give you any do- any money anyway. So what's the problem?

LEE:        I told them, I said, "If I need money and he knows I have a problem and he'll loan me money. But it's a loan. I have to pay that money back."

OMAR:       Yeah. Absolutely. I mean, this, this, this - Exactly. There was nothing given for free, never anything (background: and you never did s--t for us).

All in violation of Title 18, United States Code, Section 1512(c)(2).

The Grand Jury further charges:

## COUNT 10
(False Statements to Law Enforcement, 18 U.S.C. § 1001)

173.    Paragraphs 1-21 and 152-154 and the factual allegations set forth in Count 1 of

this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

174.    On or about September 9, 2014, in the Northern District of Ohio, Eastern

Division, Defendant OMAR ABDELQADER knowingly and willfully made material false

statements to Special Agents of the FBI in a matter within the jurisdiction of the executive

branch of the Government of the United States, that is:

    (1)    OMAR said that he did not ask Lee to intercede in the juvenile case.

    (2)    When asked by FBI Special Agents several times if Lee spoke to anyone in juvenile court about his relative's case, OMAR stated to his knowledge LEE did not intercede in the juvenile case.

    (3)    OMAR denied giving Lee anything of value in exchange for her assistance on his nephew's court case.

    (4)    When asked directly by FBI Special Agents if he had given Lee anything, to include money or anything of value, after she assisted with his nephew's case, OMAR stated, "No."

    (5)    OMAR said he absolutely did not offer anything of value to Lee after she talked to the prosecutor.

    (6)    When asked if OMAR helped Lee financially, he said, "She never asked me for nothing stuff like this."

    (7)    OMAR said he never gave her [Lee] any money.

    (8)    When asked if he had ever given Lee any money, OMAR replied, "No."

    (9)    OMAR said he never loaned Lee any money, not even as a friend.

    (10)    OMAR told FBI Special Agents with regard to Lee, "I didn't do nothing with this woman financially."

175.    OMAR ABDELQADER well knew when he made the statements to Special

Agents of the FBI that the statements were false.

All in violation of Title 18, United States Code, Section 1001.

The Grand Jury further charges:

## COUNT 11
(False Statements to Law Enforcement, 18 U.S.C. § 1001)

176.    Paragraphs 1-18 and 152-154 and the factual allegations set forth in Count 1 of

this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## The Offense

177.  On or about September 9, 2014, in the Northern District of Ohio, Eastern

Division, Defendant SAMIR ABDELQADER knowingly and willfully made material false

statements to Special Agents of the FBI in a matter within the jurisdiction of the executive

branch of the Government of the United States, that is:

(1)  SAMIR said that he was not aware of anyone asking Lee for help with his case in Summit County Juvenile Court.

(2)  SAMIR said he did not know if Lee talked with anyone regarding his case.

(3)  SAMIR stated that while Lee is a frequent, almost daily, customer in the store, she always pays for her purchases.  On infrequent occasions, the store may comp Lee a bottle of water or juice, but nothing more and not often.

178.  SAMIR ABDELQADER well knew when he made the statements to Special

Agents of the FBI that the statements were false.

All in violation of Title 18, United States Code, Section 1001.

**FORFEITURE**

179.  The allegations of Counts 1, 2, 3, 4, 5, 7, and 9 are hereby re-alleged and

incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18 ,

United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  As

a result of the foregoing offenses, defendants TAMELA M. LEE, OMAR ABDELQADER, and

ABDELRAHMAN ABDELQADER shall forfeit to the United States all property, real and

personal, which constitutes, or is derived from, proceeds traceable to the commission of such

offenses; including, but not limited to, the following:

(1)  MONEY JUDGMENT:  Defendant TAMELA M. LEE shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 1, 2, 3, 4, and 5.

(2)  MONEY JUDGMENT: Defendant OMAR ABDELQADER shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 1, 2, 3, 4, and 9.

(3)  MONEY JUDGMENT: Defendant ABDELRAHMAN ABDELQADER shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Count 7.

## SUBSTITUTE PROPERTY

180.  In the event that any property subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants:

(1)  cannot be located upon exercise of due diligence;

(2)  has been transferred or sold to, or deposited with a third party;

(3)  has been placed beyond the jurisdiction of this Court;

(4)  has been substantially diminished in value; or,

(5)  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) [as incorporated by Title 28, United States Code, Section 2461(c)], to seek forfeiture of any other property of the defendants, up to an amount equivalent to the value of the forfeitable property described above.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.